UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
----------------------------------------------------------------x
UNITED STATES OF AMERICA, *ex rel.,*      :
MARGARET HERICKS,

                                        :      No. 07-CV-0387 (JRS)

                  Plaintiff,

                                          :

                 -v-                             **SECOND**

                                         :      **AMENDED COMPLAINT**
LINCARE, INC. and LINCARE HOLDINGS, INC.,

                                         :

                  Defendants.
----------------------------------------------------------------x

        Plaintiff, United States of America ex rel. Margaret Hericks, by her

attorneys James T. Ratner, Esq. and David A. Koenigsberg, Esq. of Menz Bonner Komar

& Koenigsberg LLP, complaining of Defendants Lincare Inc. and Lincare Holdings**,** for

her complaint alleges as follows:

## I.      INTRODUCTION

      1.      This is an action to recover damages and civil penalties on behalf

of the United States of America arising from false statements, records, and claims made,

presented, and caused to be presented by the defendants and/or their agents, employees

and co-conspirators in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as

amended (the "FCA").

      2.      Defendants are corporations involved in the business of providing

home oxygen and related therapies to patients suffering from Chronic Obstructive

Pulmonary Disease ("COPD") and Congestive Heart Failure ("CHF"). Defendants

provide these services to patients who live in private residences.

      3.      Since at least 2002 and continuing to date, defendants, through

their Care Check program, have pursued an aggressive national sales campaign that

involves requiring Lincare's employees to give substantial inducements to physicians and beneficiaries to generate referrals from doctors of prescriptions for medical equipment and services reimbursable under Medicare, Medicaid and other federal health insurance programs. Through the Care Check program, Lincare offers to "take care" of the physicians' patients by making free home assessments, including free oximetry tests both before and after patients are prescribed oxygen therapy, providing smoking cessation therapy to the patients, reminding the patients to keep appointments with their doctors, and by encouraging the patients to make appointments with the doctor, when the Lincare reps will meet them at the office to discuss their health status.

        4.     The Care Check program in fact constitutes a deliberate and knowing scheme to defraud Medicare and Medicaid, by among other things, offering doctors and patients kickbacks to prescribe and/or use defendants' services.  The kickbacks are provided as follows:

        a.     The free use of Lincare employees who provide services to doctors such as respiratory therapy and medical office practice management techniques intended to reduce patient cancellations and enhance physician revenue;

        b.     Free oximetry testing on patients both before oxygen therapy is prescribed by a doctor and after a patient is receiving oxygen;

        c.     The services of Lincare respiratory therapists that are provided without charge to physicians and beneficiaries;

        d.     Expert consulting services that are provided without charge to physicians who are seeking to set up sleep labs.  Sleep labs generate a high volume of oxygen and other referrals to Lincare;

e.  Making cash incentive payments to employees for referrals of patients to be switched from non-Medicare covered medications to Medicare covered medications; and

f.  Paying employees for referrals of patients.

## II.  PARTIES

5.  Relator Margaret Hericks ("Relator") at all times relevant to this action was a resident of the State of Michigan.  From approximately May, 2004 to May, 2005, Relator was employed by defendant Lincare, Inc. as a center manager in Livonia, Michigan.

6.  Defendants Lincare, Inc. and Lincare Holdings, Inc. (collectively referred to as "Lincare") constitute a national oxygen and durable medical equipment company ("DME"), headquartered in Florida.  Lincare maintains offices and does business within the Eastern District of Pennsylvania and in 48 of the United States.  On or about August 14, 2012, Lincare became a wholly owned indirect subsidiary of The Linde Group.  Lincare is one of the country's largest oxygen and respiratory services providers.  The company's customers are patients at home who suffer from chronic obstructive pulmonary disease and require an oxygen supplement or other respiratory therapy to ease the symptoms of respiratory dysfunction.  The company serves over 700,000 customers in 48 states through approximately 1,100 operating centers.

### III.   JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3730(b) in that the claims for relief in this action are brought in the name of the United States.

8.      Venue is proper pursuant to 28 U.S.C. § 1391 in that Lincare regularly conducts business within the Eastern District of Pennsylvania, including the conduct that is the subject of this complaint.  Lincare maintains offices within the Eastern District of Pennsylvania as well.

9.      Relator is the original source of the allegations made in this complaint in that she has personal and independent knowledge of the matters set forth herein.

10.     Prior to filing the instant qui tam complaint, relator voluntarily provided to the United States Attorney's Office for the Eastern District of Pennsylvania the information contained in her complaint.

### IV.   APPLICABLE LAW

**The Medicare Program**

11.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefitting the elderly that pays for the cost of certain hospital services and care.  *See* 42 U.S.C. § 426 *et seq.*

12.     The Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the Medicare Program.  The Centers for Medicare and Medicaid Services

("CMS") is a division of that agency of the United States and is directly responsible for the administration of the Medicare Program.  CMS, in discharging those responsibilities, contracted with private insurance companies, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FI"), to receive, review, and pay appropriate claims for reimbursement for the provision of home services to Medicare Program beneficiaries.

13.     Eligible persons age 65 years and over may enroll in Medicare Part B to obtain health insurance benefits in return for payment of monthly premiums in an amount established by CMS.  Such individuals are known as "beneficiaries" under the program.

14.     Medicare Part B pays for home oxygen equipment and supplies as DME that are prescribed by a beneficiary's doctor.

15.     When a beneficiary obtains medical services from a Part B provider, the beneficiary may either pay for the service for him or her self, and submit the provider's bills to Medicare for reimbursement ("unassigned claims") or the beneficiary may assign the right to reimbursement to his or her provider, in which case the provider then submits a bill to Medicare and receive the Medicare reimbursement as the beneficiary's assignee ("assigned claim").

16.     Only providers who are "participants" may submit assigned claims for payment.

17.     In order to become a Medicare Part B participant provider, physicians and others, including DME suppliers such as Lincare, must agree to certain conditions of participation, including, the following program requirements:

        a.      not to make false statements or misrepresentations of material facts concerning requests for reimbursement, 42 U.S.C. §§ 1320a-7b(a)(1), (2), 1320a-7, 1320a-7a;

        b.      to bill Medicare only for reasonable and necessary services, 42 U.S.C. § 1395y(a)(1)(A);

        c.      to provide economical medical services, and then, only when medically necessary, 42 U.S.C. § 1320c-5(a)(1);

        d..      to assure that such services are not substantially in excess of the needs of such patients, 42 U.S.C. § 1320a-7(b)(6)(B);

        e.      to certify that the service claimed is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

        18.      42 U.S.C. § 1395nn(b) prohibits referrals to any entity furnishing durable medical equipment with which the physician has a financial relationship, compensation agreement, or from who the physician receives any form of remuneration, including the receipt of items, devices, or supplies.

        19.      Lincare is a participating provider in the Medicare Part B program and submits assigned claims directly to Medicare for payment, and likewise submits claims directly to the respective state Medicaid programs.  The federal government provides at least 50% of the funds for Medicaid.

**The Anti-Kickback Statute**

        20.      The federal health care Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically

- 6 -

unnecessary, of poor quality or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overuse or poor quality of care.

21.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person from referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

22.     Concern about illegal kickbacks by DME suppliers for referrals like those alleged in this Complaint prompted the HHS Inspector General to issue a Special Fraud Alert identifying practices that violate the Anti-Kickback law, including offering inducements to providers and beneficiaries to gain federal healthcare referrals. *See* OIG Special Fraud Alert, 60 F.R. 40847 (Aug. 10, 1995).  The OIG has issued an Advisory Opinion that warned that a DME supplier providing free overnight oximetry testing would violate the Anti-Kickback Act. OIG Advisory Opinion 06-20 (Nov. 8, 2006), *citing* Medicare Carriers Manual, Pub. 14, Chapter 3, Section 4105 (a Medicare qualifying "oximetry test cannot be conducted by a DME supplier"); *see also* OIG Advisory Opinion No. 06-01 (March 27, 2006) (illegal for home health agency to provide prospective customers with a free preoperative home safety assessment).  Further, the OIG's 1999 "Compliance Program Guidance for the Durable Medical Equipment, Prosthetics, Orthotics and Supply Industry," 64 Fed. Reg. 36368 (July 6, 1999), stated that a risk area for violating the Anti-Kickback law for a company such as Lincare is

"[p]roviding incentives to actual or potential referral sources (e.g. physicians, . . . patients, . . . or others) that may violate the [AKA] . . . ." *Id.* at 36374. The Compliance Guidance elaborated that a DME supplier should "not offer or provide gifts, *free services*, or other incentives or things of value to patients, . . . physicians, . . . or other potential referral sources for the purpose of inducing referrals in violation of the [AKA] . . . ." *Id.* at 36380 (emphasis added).

23.     Compliance with the Anti Kickback Act is a condition of payment under federally funded health care insurance programs. Lincare certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions, (including, but not limited to, the Federal anti-kickback statute. . . .)" (CMS Provider/Supplier Enrollment Application Forms 855-A and 855-B). Lincare expressly agreed to "abide by the Medicare laws, regulations and program instructions . . . ." *Id.*

24.     Under federal law, claims tainted by the payment of kickbacks are "false or fraudulent" claims within the meaning of the False Claims Act. 42 U.S.C. § 1320a-7b(b) & (g) ("a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act].").

## V.      THE FRAUDULENT SCHEME

25.      Since at least 2002, Lincare has operated the Care Check program, which Lincare describes as "a clinical service designed to meet the needs of patients with early-stage COPD." Ex. A at 1.[1]  *See also* website of Lincare Inc. and Lincare Holdings Inc., http://www.lincare.com/disease-programs.html?silverheader=0 (last visited March 25, 2013).  According to Lincare, the components of the Care Check program include home visits by licensed clinical specialists and "Respiratory assessment with screening Oximetry.  Ex. A at 1.  The program also includes working with physicians to obtain clinical feedback.  *Id.*

26.      In June 2004, Relator was sent to visit Lincare's Columbus, Ohio center for training.  There she was to learn about how they marketed Lincare's services and products.  While there, Lincare's Columbus center employees showed Relator the list of Medicare patients that had been referred to Lincare by Dr. Emmart Hoy, Columbus, Ohio, as a result of the Care Check program. Relator was told that Dr. Hoy was an enthusiastic participant in the Care Check program.

27.      Relator attended center manager training in August 2004 in Indianapolis.  She also received Care Check program training in November 2004 in Livonia, Michigan.  The Care Check training was conducted by Mr. Mickey McKenzie, National Director of Marketing and Business Development for Lincare Holdings, Inc., a position he holds today.

28.      David Morrison, Lincare's Regional Sales Manager for Relator's region, also helped conduct the training. According to Morrison, the Care Check program

---

[1]      Copies of Lincare documents that Relator obtained in the normal course of her employment at Lincare are attached hereto and referred to herein as Exhibit ("Ex.") A.

was implemented and developed by Shawn Schabel, who is currently the President and, since at least 2001, has been Chief Operating Officer of Lincare Holdings, Inc.  Morrison told the employees undergoing training that "Schabel had the vision of how to grow the oxygen" business at Lincare.

29.     At the training, Lincare provided documentation to its new employees to train them in Lincare's sales and marketing programs, including Care Check.  Among the documents provided by Lincare and explained by McKenzie were two graphs that showed how Lincare's Care Check program had succeeded in extending the length of time Medicare patients received oxygen therapy to 17 months, while the national average was 10 months.  Lincare's goal was to extend the average to 24 months.  The extended time on oxygen did not mean that the patients lived any longer, only that they were being placed on oxygen therapy sooner than otherwise.

30.     Using slides, McKenzie explained that the Lincare employees should gain access to a doctor's patients by asking the doctor to sign a "Fast Fax" Care Check order form that would enable the Lincare employee to visit a patient at home.  McKenzie further explained that the Care Check process required Lincare-employed respiratory therapists to visit patients and perform clinical assessments, including pulse oximetry tests on patients who were not yet receiving oxygen therapy.  *See* Ex. A at 1, 2.  Once Lincare gained access to a patient not yet on oxygen, Lincare would send a therapist to conduct oximetry tests until the test results qualified the patient for Medicare covered oxygen therapy.  *Id.* at 3.   The therapists were instructed to report back to the patient's physician the results of the oximetry tests:  "Report signs and symptoms of nocturnal desaturation" to the patient's doctor.  *Id.* at 2.  These services were provided

free of charge to the patient and doctor. McKenzie told the trainees that 70% of Lincare's patients required no services when the patient received the first Care Check visit.  Ex. A at 3.  The trainees were instructed on how to complete Lincare's Sales Rep Care Check Report Card, which information was tracked by Lincare nationally.  *Id.* at 4, 5.  The trainees were told to target patients "[n]ot qualified for oxygen reimbursement under Medicare guidelines."  *Id.* at 6.  They were also told to target "[a]ll COPD patients that complain of symptoms or need additional education."  *Id.*

        31.      Normally, in order to qualify a patient for oxygen therapy to be paid for by Medicare, a doctor performs an oximetry test in the doctor's office.  Through the Care Check program, Lincare made it possible for the doctor to order a Care Check from Lincare so that Lincare performed oximetry tests and provided the results for the doctor.  Each therapist visit has a monetary value of at least $85.   If the patient's results suggested they could get oxygen therapy that would be paid for by Medicare, Lincare's employees are trained to tell the doctor to order an oximetry test from an Independent Testing Facility ("IDTF") to provide the test that would qualify for and trigger Medicare coverage. Thus, when a doctor orders a Care Check, the respiratory therapist is required to visit the patient in her home and performs the respiratory assessment with an overnight oximetry assessment. The respiratory therapist then provides the overnight oximeter test results to the patient's doctor to allow the doctor to diagnose the patient's condition. Lincare provides the services at no charge to the doctor or the patients.

32.     The training included suggestions about how to conduct sales calls at doctor's offices.  The written training materials include an explanation of "Referral Relationship Building."

> When explaining our service it must be communicated how these services support the referrals business:  save time-save money-make money.  If your [sic] not stating how our services support the profitability of the practice, why should the Dr use you?  Remember it is also a business.

Ex. A at 7 (emphasis added).

33.     The Lincare employees were instructed to find out from the doctor's staff the cancellation rate for patient visits and to tell the staff that Lincare can "help reduce these with your COPD/CHF patient base."  Ex. A at 8.  The Lincare employees are told to discuss with the doctor patient and practice issues that affect practice profitability and "get commitment Lincare services would help."  *Id.*  Lincare instructed its employees to make the following sales pitches to doctors:

> As you know I am with Lincare, national respiratory company.  Our key service is disease education and management for COPD and CHF patients by Respiratory Therapists in the home, this a non-billable service we offer. I would like to discuss how you and your staff can use these services to help manage your patient base and save your practice time and money.  You would agree time = money here at your business?

*Id.* (emphasis added).

> Dr while speaking with Barb your head nurse she informed me about your cancellation rates, I think Lincare can help you reduce these with your COPD/CHF patient base.

*Id.*  The same document instructs the employee to help the doctor calculate the value of reducing the cancellation rate.

> Do calculations on all daily rates. (3 cancellations daily –
> 15 a week) establish a $ value with Dr.

*Id.*  The Lincare employees were instructed to tell the doctor "each [Lincare] assessment will result in patient visit which he can bill for."  *Id.*

34.     The Lincare employees are told that they should ask to train the doctor's staff on enrollment factors.   During training, employees are instructed to tell doctors that Lincare's free services can increase a doctor's weekly office revenue by as much as $750 to $1500 per week.

35.     The Care Check training also included written materials that described "Naked" Care Check, which meant approaching a doctor's patients who were not yet receiving from Lincare oxygen therapy or other services that Lincare offers at the time of the first visit by a Lincare employee. Ex. A at 6.  Lincare explained to the new employees that these were patients who were using Metered Dose Inhalers ("MDI"), which are not covered by Medicare. The trainees were told when they came across such patients to get them to switch to liquid Unit Dose ("UD") medications, that are covered by Medicare.  Lincare did not sell MDIs but does sell devices to deliver the UD medications.  A doctor's prescription was necessary to switch such patients to the Medicare-covered UD medicines, which prescriptions Lincare obtained by providing doctors with the free office and respiratory therapy services of Lincare employees.

36.     McKenzie also told the center managers to develop competition within geographic areas and the company, including giving cash incentives to drivers and service representatives.  Ex. A at 9.  For example, the below signs that were posted at Lincare's center in Brook Park, Ohio, a Cleveland suburb, offered drivers cash rewards for referrals of UD patients.





These types of rewards for referring UD patients were offered to drivers at Lincare centers all over the country.

37.     The training materials included role play scripts and suggested phrases that the sales personnel should use.  For example, the employees were told to tell doctors  "[g]iven the frequency and severity of desaturations, you may want to prescribe oxygen therapy."  Ex. A at 10.

38.     During the August 2004 training, the trainers, including Morrison, used Lincare's experience at its Casper, Wyoming center as a teaching example because that center was successful at obtaining referrals for oxygen therapy through Care Check. Reports about Casper, Wyoming patients were given to the trainees, including Relator. The reports, which included lists of patients, showed that Lincare obtained many new Medicare oxygen patients through the Care Check program. The documents provided to Relator during the training showed that as a result of the Care Check program, many claims were submitted to Medicare by Lincare for medical equipment (oxygen concentrators) for oxygen therapy, including, for example, the following:

a.     On or about 12/05/03, Lincare submitted a bill for an oxygen concentrator to Medicare for patient "A".  (Lincare account # 003-870-000 xxx).

b.     On or about 12/16/03, Lincare submitted a bill for an oxygen concentrator for Medicare for patient "B." (Lincare account # 003-870-000 xxx).

c.     On or about 12/31/03, Lincare submitted a bill for an oxygen concentrator to Medicare for patient "C." (Lincare account # 003-870-000 xxx).

39.     Morrison also told the trainees that Lincare used a "Cookie Cutter Approach" to marketing, meaning that Lincare operated all of its centers across the

country, approximately 1,100 in number, the same way using the same sales techniques that were the subject of the August 2004 training. According to Lincare's SEC filings, in 2004, 67% of Lincare's revenues were from Medicare and Medicaid.

40.     Following her training, Relator, who was the manager of Lincare's Livonia, Michigan center, supervised respiratory therapists in making sales calls on doctors and sometimes accompanied the therapists.  The sales calls often involved Lincare buying lunches for a doctor and her staff, which often cost as much as $250.  For example, in November 2004, Relator accompanied respiratory therapist Arlene Sudia when she made a lunch sales call on Dr. Samina Ghazi, Farmington Hills, Michigan. After discussing Care Check with Dr. Ghazi over lunch, Dr. Ghazi gave Ms. Sudia three patients for Care Checks.  *See* Ex. A at 11.

41.     In January 2005, Relator, went on a sales call with Sarah Earl, a Lincare respiratory therapist. They visited Dr. Michael Gambel of Southgate, Michigan, a doctor who had many Medicare patients receiving oxygen from Lincare.  Ms. Earl had been assigned to work for Dr. Gambel, and often, when asked, went to work in his office or visit his patients in their homes.  Herick's boss, Matt Holmes, directed that Dr. Gambel was to receive preferential treatment because Dr. Gambel referred so many patients to Lincare.  Dr. Gambel's patients received many free respiratory services from Lincare.

42.     When Relator and Ms. Earl went to see Dr. Gambel, they had several lists of Dr. Gambel's patients. The lists described various things:  patients that were to receive free oximetry tests until test results showed they could qualify for

Medicare oxygen therapy; new patients that Lincare's Med4Home[2] program wanted the doctor to know about; patients who were on Lincare oxygen but not on Medicare eligible Unit Dose therapy; patients who were on UD therapy, but not yet on oxygen; the test results for patients from free oximetry tests that Lincare had conducted on the doctor's patients during home visits that week; and a list of Dr. Gambel's patients who had UD medications with Lincare but were not re-ordering the maximum amount allowable under Medicare.

43.     Relator and Earl met with Dr. Gambel and Ms. Earl reported to Dr. Gambel about the patients she had seen and whether they qualified for Medicare oxygen or UD medications.  For the patients who would qualify for Medicare oxygen, they told Dr. Gambel he should order an IDTF test.  They also gave him the list of names that Lincare's Med4home wanted to refer to him. They gave him the charts from the oximetry tests and showed Dr. Gamble which patients they would next target since those patients would probably soon qualify for oxygen therapy eligible for Medicare.  They asked for and Dr. Gambel provided them with the names of his Medicare patients who were smokers.  They gave him multiple "Fast Fax' forms to be signed so that Lincare representatives could visit the patients at home.  Those patients were to be visited by Lincare employees for the purpose of conducting oximetry tests until the patient could be prescribed oxygen therapy that would qualify for Medicare reimbursement. This conduct was observed by Relator regularly during her one year tenure at Lincare

44.     In her capacity as a center manager, Relator personally oversaw all aspects of Lincare's business transactions in the geographic location covered by the

---

[2]     Med4Home, a mail order pharmacy that sells drugs nationwide, is a division of Lincare Holdings, Inc.

center.  She was responsible for sending the center's billing data to Lincare's regional billing office so that office could submit Lincare's claims for payment to Medicare and other federal health insurance programs, including claims for oxygen and UD equipment that were prescribed by doctors following Lincare's free oximetry tests or office services provided by Lincare employees.

45.    Lincare, through its business experience, knows that providing these inducements yields a high return in referrals for Medicare and other health insurance program business. Unfortunately for Lincare, all of this is illegal.

46.    Although CMS's rules forbid Lincare from participating in qualifying a patient for oxygen therapy reimbursable by Medicare, as set forth above, Lincare routinely provides this free service to doctors and patients.  As set forth above, central to the Care Check Program is Lincare's strategy of obtaining patient names from doctors.  Lincare makes prohibited inducements to physicians in order to learn the names and phone numbers of patients who either may currently need to be put on oxygen or are likely to need oxygen in the near future.  Once a physician accepts Lincare's inducements and agrees to do business with Lincare, Lincare conducts free oximetry tests on these patients at 30-day intervals until a need for oxygen is demonstrated.  Lincare then arranges for a third-party to test the patient to confirm Lincare's findings.

47.    According to Lincare, at any one time, the company provides oxygen therapy to approximately 550,000 patients in the United States.

48.    Claims for payment are submitted to the United States with full knowledge by Lincare that it was in material violation of its explicit certifications to CMS that it was not violating the Anti-Kickback Act.

49.     Lincare had actual knowledge that it was illegal to provide free services to doctors and beneficiaries, such as free oximetry testing and other respiratory services, in order to gain business.  Lincare's actual knowledge of the illegality of its conduct is demonstrated by the fact that Lincare has a pattern and history of engaging in kickback schemes and government enforcement action. In 2006, Lincare paid a $10 million fine to the federal government to settle allegations by the government that it had engaged in a pattern of paying kickbacks to physicians.  Lincare entered into a corporate integrity agreement with the government wherein it acknowledged that it was aware that offering free services or products to patients or healthcare providers was a violation of the FCA, and promised not to engage in this conduct.

50.     Lincare has long been on notice that giving free oximetry testing and other things of value to beneficiaries or providers was illegal.  The Office of the Inspector General for the Department of Health and Human Services has since at least 1995 been on record as forbidding the offering of inducements to providers and beneficiaries to gain federal healthcare referrals.  *See* OIG Special Fraud Alert, 60 F.R. 40847 (Aug. 10, 1995); OIG Advisory Opinion 06-20 (Nov. 8, 2006) (illegal for durable medical equipment supplier to provide free overnight oximetry testing to patients); *see also* OIG Advisory Opinion No. 06-01 (March 27, 2006).  Lincare's management has been aware of these OIG advisories, yet has refused to comply with their warnings regarding kickbacks.

51.     Lincare's Casper, Wyoming center alone submitted 530 claims to Medicare for oxygen in January 2003, 531 claims in February, 2003, and 534 claims in March, 2003.  This conduct has been repeated each month at the hundreds of Lincare

service centers around the country from 2002 to date, representing millions of individual

false claims.  Indeed, Lincare's SEC Form 10-K for the years 2005 and 2011 each state

that Lincare accepts assignment of insurance benefits from customers, and "in most

instances, invoice and collect payments directly from Medicare [and] Medicaid . . . ."

According to Lincare's SEC filings, in each of 2002, 2003, 2004, and 2005, 67% of

Lincare's revenues were from the Medicare and Medicaid programs. More recently, in

2009, 2010, and 2011, the SEC filings state that Medicare and Medicaid have been the

source of at least 60% of Lincare's revenues.  This data demonstrates that it is more

likely than not that Lincare's services and equipment are paid for by a federal

government health care program.

**FIRST CAUSE OF ACTION**
**(31 U.S.C.  § 3729(a)(1), (2) and (3))**

52.    Relator incorporates by reference paragraphs 1 through 51 of this

Complaint, as if fully set forth herein.

53.    Defendants, by use of a widespread practice of  making kickbacks

to federal healthcare beneficiaries, providers, and employees with the intent to obtain

referrals to supply durable medical equipment for oxygen therapy to be paid for by

federal healthcare payers, defendants have engaged in a continuous practice of:  (a)

knowingly presenting, and causing to be presented, to an officer and employee of the

United States Government, false and fraudulent claims for payment and approval; (b)

knowingly making, using, and causing to be made and used, false records and statements

to get false and fraudulent claims paid and approved by the Government; and (c)

conspiring to defraud the Government by getting false and fraudulent claims allowed or

paid, in that defendants made claims to the Medicare and other and other Government

funded health insurance programs for reimbursement for the treatment of patients referred to the defendants as a result of illegal remuneration as alleged herein, all in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3).

54.     As a result of this false and fraudulent conduct the United States Government was damaged in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (31 U.S.C.  § 3729(a)(1), (2), and (3))

55.     Relator incorporates by reference paragraphs 1 through 54 of this Complaint, as if fully set forth herein.

56.     Defendants, in connection with submissions to the Medicare and other federal health insurance programs, made or caused to be made false statements with regard to Lincare's compliance with CMS's regulation forbidding DME suppliers from participating in the qualifying oxygen test and thereby (a) knowingly presented, and caused to be presented, to an officer and employee of the United States Government, false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the Government; and (c) conspired to defraud the Government by getting false and fraudulent claims allowed or paid, in that Defendants caused the submission of false claims to the Medicare and other federal health insurance programs all in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3).

57.     As a result of this false and fraudulent conduct the United States Government was damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (31 U.S.C. § 3729(a)(1), (2), and (3))

58.     Relator incorporates by reference paragraphs 1 through 57 of this Complaint, as if fully set forth herein.

59.     Defendants, by use of a widespread practice of making kickbacks to federal healthcare beneficiaries, providers, and employees with the intent to obtain prescriptions from doctors switching patients from Metered Dose Inhalers not covered by Medicare to Unit Dose medications covered by Medicare (a) knowingly presented, and caused to be presented, to an officer and employee of the United States Government, false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the Government; and (c) conspired to defraud the Government by getting false and fraudulent claims allowed or paid, in that Defendants caused the submission of false claims to the Medicare and other federal health insurance programs all in violation of 31 U.S.C. §§ 3729(a)(1), (2) and (3).

60.     As a result of this false and fraudulent conduct the United States Government was damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of herself individually, and acting on behalf, and in the name, of the Government of the United States, respectively, demands and prays that judgment be entered against the Defendants as follows:

a.      That the Defendants shall be ordered to cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-3732.

b.      On all Causes of Action, judgment shall be entered against Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest.

c.      That Relator shall be awarded the maximum amount available under Section 3730(d) of the False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the Government intervenes in the matter (or pursues its claim through any alternate remedy available to the Government, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the Government declines to intervene.

d.       That Relator shall be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

e.      And, such other relief shall be granted in the favor of the United States and the Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator

hereby demands trial by jury.

Dated:     Woodstock, New York
March 27, 2013

Respectfully submitted,

JAMES T. RATNER, ESQ.
P.O. Box 1035
Woodstock, NY  12498
(845) 688-5222
jamestratner@yahoo.com
Pa. State Bar Id. 81009

MENZ BONNER KOMAR &
KOENIGSBERG LLP

By:                           
David A. Koenigsberg, Esq.
*Admitted Pro Hac Vice*

444 Madison Avenue, 39th Floor
New York, New York 10022
Tel.:  (212) 223-2100
dkoenigsberg@mbkklaw.com

*Attorneys for Relator Margaret Hericks*

24

# EXHIBIT A



# Lincare's standard of care for your COPD patients...



# A clinical service designed to meet the needs of early stage COPD patients



**Patient Education**



**Assessment**



**Oximetry**

## Components

Home visits by licensed Clinical Specialists

Education on disease process, prescribed therapies and equipment management

Respiratory assessment with screening Oximetry

Follow-up reporting

## Benefits

Improved patient compliance through patient education

Clinical feedback in a timely manner

Improved quality of life



Contact us at:

© 2004 Lincare Inc.

L-00-1016 (04/04)

Ex. A:1



**CareCheck Process**

- Visit the patient and perform a clinical assessment

  – Subjective Information
  – Objective Information
    • Vital signs
    • Breath sounds
    • Pulse oximetry
  – Plan
    • NO recommendations



**Clinician's Role**

- Look at the whole patient
  – Appearance
  – Complaints
  – Pulse rate and strength
  – Respiratory rate, depth, and effort
  – Plus oximetry
  – Report signs and symptoms of nocturnal desaturation
- Patient assessment <u>and</u> oximetry should be included with every report back to the physician



**Follow-Up**

- For those patients that do not desaturate?
  – When?
  – Why?

- For those patients that do desaturate?
  – When?
  – Why?

Ex A:2

15



## Patient Enrollment and Completion Process

Patient identified for Lincare assessment

↓

Fill out Verbal Order for Respiratory Services have Dr sign fax to Lincare

↓

Lincare completes assessment and with patient schedules appt with Dr

↓

Lincare Sales Rep delivers assessment next day and covers with Dr, obtains rx for O2 or UD if patient need and rx for repeat pulse ox to show improvement  (1-2 min max with Dr)

If no patient clinical need Dr may forward for Sleep study or make other changes to patient regiment (70% of patients fall into this category)

*So keep on revisiting until they qualify*

↓

Lincare sets up O2 repeats oximetry and delivers report and covers with Dr.

If patient improvement patient stays on O2

If no patient improvement Dr may forward for Sleep study or make other changes to patient regiment

↓

Patient visits Dr to discuss

*70% of care checks won't need VD or Oxy*

Ex. A:3

## Working the Reports *(Internal)*

- Assign a point person
- Unit Dose patients
- Nebulizer customers
- Group patients by physicians
- Enter patients into the COPD Tracking Logs

## Assist the Sales Rep *(External)*

- Schedule sales calls to discuss Unit Dose and CareCheck

## CareCheck Process

- CM's Role in CareCheck Checklist

## Sales Call Tools

- CareCheck Trifold Presentation folder

_____

_____

_____

_____

_____

_____

_____

## CareCheck Process

- Request Plan of Treatment

- Take several blank copies with you

- Take several copies that are partially filled out

_____

_____

_____

_____

_____

_____

## CareCheck Process

- Hand deliver all results to the physician in a timely manner
  - Highlight areas of concern
  - Do not fax or drop off

- Track results on Sales Rep CareCheck Report Card and report to Marketing Rep weekly

_____

_____

_____

_____

_____

_____

## "*Naked*" CareCheck

- Non-Lincare COPD patients
  - Not currently on Unit Dose
  - MDI users

## Patient Selection

- Early stage COPD patients
- Not qualified for oxygen reimbursement under Medicare guidelines at rest
- Complain of dyspnea on exertion and / or during sleep
- Nebulizer, Unit Dose, MDI, DPI patients
- All COPD patients that complain of symptoms or need additional education

## Seeing is Believing...Sales Tools

- Early Intervention CEU video
- Sales Support Literature
- Patient Agenda for Clinicians

# Referral Relationship Building

- Better to build relationship beginning with staff then move to the physician.

- Do you realize what your asking for and what position it puts the referral in and what environment it puts you in? Think long term while building the relationship- it's a marathon not a sprint!

- When explaining our services it must be communicated how these services support the referrals business; save time-save money-make money. If your not stating how our services support the profitability of the practice; why should the Dr use you? Remember it is also a business.

- In order to accomplish this you must gain specific information by asking the right questions in the beginning.



**Sales call #1**
Give business card to receptionist and ask "I would like to schedule an appt next week with the Office Manager or Head Nurse"

Remember to ask: "what is the best time when he/she is not so busy"

**Sales call #2**
When meeting with Office Manager or Head Nurse complete Practice Profile and CFR while explaining how our services can help practice save time/money as well as help patients. Also ask to introduce yourself to phone nurse/nurses or whoever makes or takes patient calls. Gain agreement from Manager and Nurses that services would help practice and patients. Ask for a short 5 minute meeting next week with Physician to cover information

Patience is key
Do not over sell here, stick to simple info and ensure it is understood

**Sales call #3 Phase 1**
When meeting with Physician establish your purpose. "Dr, thank you for you time today. As you know I am with Lincare, national respiratory company. Our key service is disease education and management for COPD and CHF patients by Respiratory Therapists in the home, this is a non-billable service we offer. I would like to discuss how you and your staff can use these services to help manage your patient base and save your practice time and money". "You would agree time = money here at your business?"

Keep this meeting to 5 minutes as you requested

lk $$ to DR

**Sales call #3 Phase 2**
Discuss answers to questions from Practice Profile with Dr using staff names. " Dr while speaking with Barb your head nurse she informed me about your cancellation rates, I think Lincare can help you reduce these with your COPD/CHF patient base." Discuss with Dr these everyday practice & patient issues that effect practice profitability and patient quality of life and then get commitment Lincare services would help.

Do calculations on all daily rates. (3 cancellations daily = 15 a week) establish a $ value with Dr.

Remember to tell Dr each assessment will result in patient visit which he can bill for

**Sales call #3 Phase 3**
Using example Factor for Enrollment for Lincare Assessment explain to Dr he can develop his own factors for enrollment or use this example to initiate utilization of Lincare service. Once Dr has decided show them the process diagram of how it will flow from beginning to end. Confirm if this progression is ok. Once agreed upon process is established, ask Dr if it is ok to train his staff on enrollment factors with the Office Manager or Head Nurse.

Remember to ask for a patient so they can see how it works.



## *Steps to UNIT-DOSE Success*

1) Program education for all personnel with emphasis on patient benefits.

2) Understanding of each center member's role in program.

3) Point person identified. Compliance call person assigned. Compliance calls made.

4) Clear understanding of goals (growth). Progress/Activity board posted in center to mark goal and progress.

5) Sales rep and center manager agree on referral source targets. Sales calls planned, activity entered into STS.

6) Placement of starter dose kits.

7) Print out of "Doctors with Starter Doses" list, posting with CSR.

8) Center manager monitors CSR intake conversations to ensure unit-dose offered with nebs and oxygen

9) Develop competition within area and company.

10) All personnel able to articulate the defining characteristics of Unit Dose program compared to competitor's unit dose programs.

11) Role plays: sales, CSR, Service Reps

12) Feedback to center on how they are doing.

# SUGGESTED VERBIAGE

"Given the frequency and severity of desaturations, you may want to prescribe oxygen therapy. And then we will repeat the overnight oximetry in order to evaluate the correction of the hypoxemia, and to discover if there is evidence of sleep disordered breathing which you may want to investigate further with a sleep study."

Case 2:07-cv-00387-JS  Document 57  Filed 05/28/13  Page 36 of 37

**Sales Person**            Call Date

---

relationship with that provider      none

---

**Zazaian Andrew**    Call Type:Cold Call    11/11/2004
Note: Dr. will speak to reps, you just have to   Follow up:
wait.  Mondays after 1pm the best time to
call on this office. This office does not
allow lunches.        Call on that office Monday after
          1:00pm

---

**Adler Corrine**    Call Type:Cold Call    11/23/2004
Note: cold call-walked in, introduced myself   Follow up:
and Lincare. Receptionist said to fax
over what insurances we take    fax ins over to office

---

**Erickson Martin**    Call Type:Cold Call    11/23/2004
Note: spoke to Craig the office mgr   Follow up:discuss with Frank Page for f/u

---

**Friedman Jacqueline**    Call Type:Cold Call    11/23/2004
Note: walked in, introduced myself and   Follow up:
Lincare.Asked what the protocol in that
office is for refferels. Receptionist
said Craig the office mgr handles that.
Asked to speak to him.Craig said he'd
take my info and consider us    call Craig the office mgr.

---

**Ghazi Samina A**    Call Type:Lunch    11/23/2004
Note: topic of luncheon was carechecksDr gave   Follow up:
Arlene Sudia 3 pts for Care checks. Dr
has been in this office 10 months.Dr's
husband was there, he is laid off from
his job as a Polymer Scientist.    Arlene will conduct the 3 carechecks

---

**Linden Melvin**    Call Type:Cold Call    11/23/2004
Note: went in office and asked to speak with   Follow up:
Michelle--the nurse that calls the DME'sI
asked Michelle if she would consider
Lincare. She asked that I fax the
insurances list.    faxed the ins list to her
       Will call her next week

---

**Adler Corrine**    Call Type:Cold Call    11/24/2004
Note: faxed our ins list over to DR   Follow up: call next week

---

**Demeireles Doctor**    Call Type:Cold Call    12/07/2004
Note: Met with Cindy Parker the office mgr   Follow up:host a luncheon to explain our
       services

---

**Garg Doctor**    Call Type:Cold Call    12/07/2004
Note: met with Cindy parker the office mgr   Follow up:host a luncheon 12-16-04

---

**Kaniowski Thomas**    Call Type:Cold Call    12/07/2004
Note: talked to Cindy parker --the office   Follow up:
mgr.they specialize in geriatrics.    host a luncheon to discuss our
       services

---

**Shah Ashwin**    Call Type:Phone    12/08/2004
Note: called the dr. office to see if I could   Follow up:
set up a meeting. The Dr himself answered
the phone. He said to mail him a list of
the insurances we take and that he will
keep us in mind.    send literature to Dr.

---

Hericks, Margaret A Total :      21

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
-------------------------------------------------------------------x
UNITED STATES OF AMERICA, *ex rel.*                    :
MARGARET HERICKS,
                                                       :     No. 07-CV-0387 (JRS)
                          Plaintiff,
                                                       :

                          -v-
                                                       :
LINCARE, INC. and LINCARE HOLDINGS, INC.,
                                                       :
                          Defendants.
-------------------------------------------------------------------x

## CERTIFICATE OF SERVICE

I do hereby certify that copies of the Second Amended Complaint of Plaintiff-

Relator Margaret Hericks have been served via First Class U.S. Mail and electronic mail upon

the following persons at the postal and email addresses listed below:

Larry B. Selkowitz, Esq.
The Law Offices of Alan M. Gnessin
2080 Linglestown Road, Suite 201
Harrisburg, PA  17110
Email: lbs@gnessinlaw.com
Attorney for Defendants

and

Jacqueline C. Romero, Esq.
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106-4476
Email:  Jacqueline.Romero@usdoj.gov
Attorney for the United States of America

Dated: New York, New York
       March 27, 2013

_____
David A. Koenigsberg